## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.:

CROCS, INC., a Delaware corporation

      Plaintiff,

v.

JOYBEES LLC, a Delaware limited liability
company, and
KELLEN MCCARVEL, an individual.

      Defendants.

---

### CROCS, INC.'S COMPLAINT

---

Plaintiff Crocs, Inc. ("Crocs"), by and through undersigned counsel, files this Complaint against Defendants Joybees LLC ("Joybees") and Kellen McCarvel (together, "Defendants") and alleges as follows:

### INTRODUCTION

1. In this action, Crocs seeks redress for Defendants' misappropriation and use of Crocs's trade secrets and other proprietary and highly confidential business information that Defendants have used without authorization to develop, manufacture, and market footwear products for the knockoff brand Joybees.

2. This is not the first time that Joybees and its CEO Kellen McCarvel have been caught with Crocs's trade secrets. McCarvel joined Joybees just months after he left a midlevel management position at Crocs with a tranche of several thousand documents containing Crocs's highly confidential and proprietary business information, as well as the contents of an entire Crocs

email account that McCarvel has never returned to Crocs. McCarvel stole those documents and emails by downloading them onto a personal USB drive from a folder on his laptop he aptly named "Take," which he then took when leaving Crocs the next day. Then, McCarvel used the stolen documents to build a rival shoe company, Joybees, to compete against Crocs. In fact, this was McCarvel's plan from the time he decided to leave Crocs. McCarvel knew that his father would shortly be bidding in a court-ordered bankruptcy auction to acquire the assets of another knockoff shoe company, U.S.A. Dawgs, Inc., and McCarvel sought to participate in the acquisition of those assets to leverage them for a new knockoff venture.

3.     When McCarvel got caught the first time with Crocs's stolen documents, he lied about it. On April 7, 2021, he executed an affidavit and swore under oath that he had neither accessed nor used any of the stolen Crocs documents, and that he had since deleted all Crocs documents from his devices. To account for the stolen documents, he mailed to Crocs two USB drives, and represented in a sworn affidavit that the two drives contained all of the documents and emails he had taken from Crocs. An internal forensic investigation determined, however, that these representations were materially untrue. McCarvel failed to return a material amount of the "Take" folder documents, and never returned any portion of the emails.

4.     McCarvel's unwillingness to be truthful and take responsibility for his actions forced Crocs to court, as there was no reason to believe that Joybees would voluntarily cease using the stolen Crocs documents from the "Take" folder, which included Crocs's marketing plans, financial metrics and customer lists. On October 22, 2021, Crocs filed an action in the United States District Court for the District of Colorado for McCarvel's breach of contract and the theft of Crocs's trade secrets via the "Take" folder, as well as other claims related to Joybees's and

McCarvel's acts of unfair competition and unauthorized use of the Crocs Word Mark, which Joybees used to promote and position the Joybees brand.

5.     This lawsuit concerns additional forms of theft and misappropriation separate and apart from McCarvel's original theft. It focuses on the solicitation, disclosure, receipt, and use of Crocs's trade secrets that were stolen by other means at other times. Namely, the highly confidential and proprietary information at issue in this lawsuit concerns the specifications, standards and test and audit methods that dictate the quality and performance of the shoe material and various other components that are used to make Crocs footwear, as well as standards that manufacturers of Crocs footwear must adhere to. While the misappropriated information at issue here represents an expansion of misappropriated trade secrets and proprietary information beyond the documents that McCarvel himself stole in 2018, the use of such information reflects an ongoing effort by McCarvel and Joybees to piggyback off of the success of the Crocs brand by unfair and illegal means.

6.     McCarvel and others at Joybees understood that there were aspects of the manufacturing process that would be costly and time-intensive to address if Joybees wanted to produce large volumes of molded footwear that could come as close as possible to looking and feeling like authentic Crocs shoes or footwear of an equivalent level of quality and consistency. In particular, McCarvel and Joybees understood that the ability to consistently produce high-quality footwear, free of manufacturing defects, was necessary to place and keep Joybees's products on the shelves of major retailers. McCarvel also sought to skip the years-long research and development process needed to independently develop high-quality material specifications and quality standards for Joybees. However, McCarvel and Joybees's management knew that Joybees did not have such specifications or standards and that it would take years to develop them.

McCarvel and Joybees thus sought help from anyone who could supply Joybees with Crocs's material specifications and standards, knowing that Joybees could use them to make decisions about shoe material performance, components, and manufacturing and quality control processes that would be necessary to Joybees's ability to manufacture and sell appreciable quantities of footwear products.

7.      McCarvel and others working on behalf of Joybees thus solicited and hired the help of former and current Crocs employees and agents with different skillsets, knowledge, and documentation relating to the design, development, and manufacturing of Crocs footwear, and did so with the aim of making Joybees footwear according to the same proprietary material specifications, component specifications and other quality standards and related test methods that Crocs uses for Crocs footwear. This included a former Crocs Quality Engineer, former Crocs Director of Manufacturing, and former Crocs Operations Manager, all of whom Joybees hired to take on similar roles and duties for Joybees. Each of the former and current Crocs employees and agents solicited by Joybees and McCarvel had access to, or knew information about, Crocs's specifications and quality standards, and several divulged whole libraries of Crocs documents containing Crocs's trade secrets and proprietary information. These documents were clearly and prominently labeled as highly confidential and proprietary information belonging to Crocs, such that Defendants and their employees or agents would have known, and did know, that they were not authorized to disclose or use the information contained in the Crocs documents. The former and current Crocs employees, including McCarvel, also knew from their own experiences producing Crocs footwear and professional obligations that information like material specifications and quality standards was subject to confidentiality restrictions and prohibited from disclosure or unauthorized use.

8.      The specifications, standards, and test methods misappropriated by Defendants are highly sensitive and valuable trade secrets. For instance, the misappropriated trade secrets and proprietary information include a copy of Crocs's Material Performance Standards, which is a thirty-five page document containing the proprietary specifications and test methods that Crocs uses to ensure that the materials and components used in Crocs footwear meet commercial performance needs that Crocs has developed based on years of experience and customer feedback. Joybees did little more than replace its name and logo for Crocs's name and logo, and forwarded the document to its manufacturers. Joybees did so to secure and meet the requirements of lucrative and high-volume distribution agreements with several large U.S. retailers.

9.      The misappropriation of Crocs's trade secrets, as well as the unauthorized use of other highly confidential and proprietary information, constituted a breach of the former and current Crocs employees' confidentiality and non-disclosure agreements, their employment agreements and/or other Crocs policies created to restrict and prohibit unauthorized access to Crocs's confidential business information. Similarly, the misappropriation and unauthorized use breached non-disclosure agreements that bind Crocs's manufacturing partners and agents. However, McCarvel and others working on behalf of Joybees encouraged former employees to undertake illicit activities that violated the terms of these agreements and confidentiality obligations. They also interfered with such agreements by contacting current Crocs employees during the process of developing Joybees footwear and encouraging those employees to share Crocs's trade secrets, proprietary information and/or know-how that Joybees then used to produce its knockoff footwear.

10.     By following this scheme, Joybees was able to accomplish in just a few months what had taken Crocs nearly a decade of research, development, and experience. Using trade

secrets stolen from Crocs, Joybees developed a guide to nearly every aspect of the manufacturing process that it could share with its manufacturers for quality control purposes and use in the satisfaction of potential auditing requirements from any major retail partner. On information and belief, Joybees now uses Crocs's trade secrets and proprietary information in the production of every single footwear article it produces for sale.

11.     Joybees's implementation of Crocs's trade secrets and proprietary information in the production process gave Joybees a significant competitive advantage that Joybees did not earn and would not have enjoyed otherwise.

12.     Through this action, Crocs seeks to put a stop to Defendants' misappropriation of Crocs's material specifications, component specifications, quality standards, and related testing and audit methods. Damages attributable to Crocs's lost sales or Defendants' unjust enrichment are also warranted, but are an inadequate remedy to the ongoing harm caused by Defendants' unlawful acts.

## PARTIES

13.     Crocs is a Delaware corporation with its principal place of business located in Broomfield, Colorado.

14.     On information and belief, Defendant Joybees is a Delaware limited liability company with its principal place of business at 3455 Ringsby Ct., Suite 141, Denver, CO 80216. Joybees manufactures its Joybees-branded footwear using contract manufacturers based overseas, in countries such as China and Mexico. Joybees sells footwear via a network of distributors and wholesalers, as well as online to consumers via its own website and third-party sites such as Amazon.com, and in various brick-and-mortar stores throughout the United States.

15.     On information and belief, Defendant Kellen McCarvel is a citizen and resident of Colorado. McCarvel is a former midlevel Merchandising Manager for Crocs. Since 2018, McCarvel has served as CEO of Joybees.

## JURISDICTION AND VENUE

16.     This Court has personal jurisdiction over each of the Defendants because they have committed tortious acts within the District and/or have committed tortious acts outside the District that have caused injury to Crocs within the District. The Court independently has personal jurisdiction over Defendant McCarvel because he is a resident of this District, and over Defendant Joybees because Joybees is a resident of this District and has its principal place of business in this District.

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, as this dispute arises by virtue of Defendant's violations of, *inter alia*, 18 U.S.C. § 1836, *et seq*., and the trade secrets at issue include the highly sensitive material and components specifications for the shoe material and components in Crocs footwear sold all over the world. 18 U.S.C. § 1836(b)(1).

18.     This Court also has supplemental jurisdiction over Crocs's state-law claims pursuant to 28 U.S.C. § 1367 because they are so related to Crocs's federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

19.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claim occurred in this judicial district— namely, the solicitation and receipt of Crocs's trade secrets and proprietary information. Venue is otherwise proper in this judicial district under 28 U.S.C. § 1391(b)(3), as Joybees and McCarvel reside in this judicial district and are subject to the court's personal jurisdiction.

## FACTS RELEVANT TO ALL CLAIMS

### A. McCarvel and Joybees's Founding Members Acquire an Initial Inventory of Knockoff Footwear

20.     The story of Joybees begins with another knockoff shoe company, USA Dawgs, Inc., whose "Dawgs" branded footwear was previously found to infringe certain Crocs utility and design patents in multiple proceedings.

21.     Defendant McCarvel learned about the Dawgs knockoff brand from his father John McCarvel, a former Crocs CEO. Upon learning this, while still employed by Crocs, Defendant McCarvel became interested in going into the knockoff footwear business.

22.     On January 31, 2018, USA Dawgs, Inc. filed bankruptcy in the U.S. District Court for the District of Nevada. Because USA Dawgs, Inc. failed in its efforts to reorganize in bankruptcy, its assets, including its footwear inventory, were subject to sale at a court-ordered bankruptcy auction conducted on or around June 29, 2018. After learning of this, and the fact that his father was an investor in one of the entities bidding on the USA Dawgs, Inc. assets, McCarvel left his position at Crocs, intending to involve himself in the acquisition of the USA Dawgs, Inc. assets, and leverage those assets to launch a new shoe brand.

23.     At the bankruptcy auction, the bidder that acquired the Dawgs brand footwear assets was a holding company, Dawgs Holdings LLC, which then transferred substantially all of the acquired assets to USA Dawgs LLC. Dawgs Holdings LLC and USA Dawgs LLC were majority owned and controlled by an entity called Optimal Investment Group. Following this acquisition, and not long after McCarvel left his midlevel position at Crocs, McCarvel began working with the newly-formed USA Dawgs LLC.

24.     McCarvel and USA Dawgs LLC began selling knockoff footwear under the Dawgs brand in or around August 2018, aided by former employees, officers, and agents of USA

Dawgs, Inc. who assisted in developing a business plan to rebrand "Dawgs" footwear by launching a new knockoff shoe brand altogether. In November 2018, USA Dawgs LLC named McCarvel its CEO.

25.     The Dawgs footwear products and brand assets that McCarvel and USA Dawgs LLC had acquired were of much lower quality than Crocs footwear products, and further, several designed previously sold by USA Dawgs, Inc. were subject to well-founded claims of patent infringement. In particular, Dawgs-branded footwear was made using lower-quality materials and inadequate manufacturing and quality control measures, such that the footwear manufactured for the Dawgs brand was perceived as being low-quality. Rather than continuing to sell the substandard Dawgs-branded footwear, in 2019, USA Dawgs LLC and McCarvel ceased those sales and donated the remaining Dawgs footwear inventory to various non-profit organizations.

26.     By late 2019, USA Dawgs LLC had ceased selling Dawgs-branded footwear, renamed itself Joybees, and began preparations to launch Joybees as a new consumer-facing footwear brand in early 2020, created to more closely mimic Crocs's most successful footwear products.

**B.  Joybees Launches After Soliciting Crocs's Material Specifications and Developing a New Product Line**

27.     As part of the efforts to develop a new Joybees product line, McCarvel recruited help from others who had worked in producing footwear for Crocs. From the very beginning, McCarvel, and other former Crocs employees or agents recruited by McCarvel, looked to Crocs as a standard-bearer and sought to leverage their experience producing footwear for Crocs to produce and sell footwear for Joybees.

28.     McCarvel solicited, consulted with, and/or hired former and current Crocs employees and agents who were knowledgeable about Crocs's confidential and proprietary technology with respect to the material and component specifications, manufacturing and quality control measures, and factory audit procedures. These recruits included Thomas Tong, a former Crocs Operations Manager and Teddy Xue, a former Crocs Quality Engineer.

29.     As a former Crocs employee who was himself subject to Crocs's confidentiality agreements, McCarvel knew or should have known that former and current Crocs employees were bound by employment agreements and/or non-disclosure agreements that prohibited them from disclosing the highly confidential information about Crocs's material and component specifications that McCarvel and Joybees were seeking.

30.     McCarvel also began communicating with potential or actual manufacturers about the specifications that could be used to produce Joybees footwear. However, McCarvel did not have an independent understanding of what Joybees needed to do to develop material and component specifications and the testing required to implement those specifications, and he relied on his consultations with others to communicate with manufacturers about how to achieve his goals for Joybees.

31.     During this process, McCarvel solicited and received a copy of Crocs's confidential material specifications, which he then relied on while communicating with manufacturers about the material specifications that would henceforth be used for Joybees products.

32.     McCarvel and others at Joybees used Crocs's material specifications with the goal of developing a far higher-quality shoe material in far less time than Joybees would have been able to develop without the use of Crocs's material specifications, despite their understanding that those

specifications were considered highly confidential and subject to confidentiality and non-disclosure agreements.

33.     Joybees was initially unable to implement the complete version of the Crocs material specifications that McCarvel had solicited and received due to logistical and/or financial restraints.

34.     McCarvel continued to request material specifications from potential or actual manufacturers, and requested that the specifications be similar or the same as Crocs's specifications. However, McCarvel was unable to find a manufacturer to disclose or implement Crocs's material specifications or material specifications like Crocs.

**C. Joybees Launches Its New Product Line And Begins Developing Material And Component Specifications, Quality Standards, and Test Methods Based on Crocs's Trade Secrets and Proprietary Information Concerning Same**

35.     On or around January 20, 2020, Joybees announced the launch of its new product line of molded foam footwear.

36.     Defendants had failed to develop material specifications, component specifications, or quality standards for its footwear prior to launching the Joybees brand.

37.     Matching Crocs's specifications and quality standards was critical to securing and retaining distribution agreements with major national retailers, and for this reason, in or around June 2021, Defendants began seeking out new manufacturing partners and began making plans to develop specifications and standards that Joybees could share with manufacturing partners and/or test labs.

38.     Defendants relied on former Crocs employees and agents to develop Joybees's material and component specifications, quality standards, and related testing and audit methods,

which they did by copying and/or using Crocs's trade secrets and other highly confidential and proprietary information that they had no right to use for Joybees products.

39.     Defendants not only solicited, received, copied, disclosed, used, and/or misappropriated the specific combination of parameters that encompass Crocs's material and component specifications, but also the precise values and specific testing methods used to achieve the material and component specifications.

40.     Initially, Joybees set out to copy a subset of the parameters found in Crocs's material specifications for its molded foam footwear. McCarvel considered proposals to directly copy the specifications used by Crocs, but was concerned that the cost of implementing the full set of Crocs's material specifications would be too high for Joybees. Thus, McCarvel had Thomas Tong, a former Crocs Operations Manager, develop a set of parameters that, while directly copied or based on the Crocs specifications Tong disclosed for use by Joybees, were less rigorous than the set of parameters used in Crocs's specifications and later copied by Joybees. The Crocs documents that Tong copied and used to create Joybees's material specifications were clearly and prominently marked with confidentiality designations indicating that the specification information was confidential and/or proprietary to Crocs. McCarvel knew that this initial set of material specifications was derived directly from Crocs's highly confidential material specifications, but nevertheless personally forwarded them to Alejandro Melgar, a former Crocs consultant who was now working with Joybees's manufacturing partners in Mexico, with the intent that they be used to manufacture Joybees footwear in Mexico.

41.     The material specifications that Joybees ultimately developed and sent to at least two manufacturing partners in China were directly copied from a Crocs "Material Performance Standards" document. The version of this document used by Joybees was also referred to as

"Material Performance Standards," as well as "Test Performance Standards," and contained Crocs's material specification information copied directly from the Crocs document. Joybees had the Crocs logo from that document replaced with its own. Instead of references to "Croslite," which is the commercial name for the molded foams used in Crocs footwear, the Joybees version of the Material Performance Standards referred to "Joyslite." Similarly, "Crocs Lock™," a trademarked consumer-facing brand used in certain Crocs work shoes, was changed to "Joybeeslock™," despite the fact that Joybees has never offered a product using the brand "Joybeeslock" or sought trademark protection for such a brand. The document was thus a near-perfect copy of Crocs's own specifications and standards, except where such superficial changes had been made. But Joybees did not fully cover its tracks either. For instance, Joybees updated most time-and-date references to then-present day, but missed at least one reference to August 27, 2009, which was a reference found repeatedly in Crocs's own documents and, furthermore, a date in time nearly one decade prior to Joybees's existence. Focused on copying Crocs's specifications for molded foam, Joybees also neglected to remove from its version of the Material Performance Standards document references to Crocs's specifications for other types of shoe materials, such as leather, for which Joybees had no need since, unlike Crocs, Joybees did not produce any shoe models using those materials. Moreover, the Joybees material specifications were identical to, or substantially the same as, Crocs's material specifications across every parameter and value.

42.     On or around September 30, 2021, Teddy Xue, a former Crocs Quality Engineer working at the direction of Defendants, sent the Joybees version of the "Material Performance Standards" document to Joybees's manufacturing partners in China, thereby disclosing Crocs's trade secrets and proprietary information and putting them to use for Joybees. The same document

was also sent to Joybees's manufacturing partners in Mexico, either by McCarvel or another individual acting at Joybees's direction.

43.     Joybees also needed test methods to implement its specifications. Thus, Mr. Xue and Mr. Tong prepared dozens of test methods for Joybees. But these test methods were copied from Crocs documents. The Crocs logo was again swapped out for the Joybees logo. Superficial edits were made to the names of various test methods, such as by altering one or two letters appearing in the name of the test method. In at least one instance, pictures of Crocs footwear as examples explaining how the test should be performed, as well as other references to Crocs, were left in the document. And, in place of the names of Crocs employees, Mr. Xue and Mr. Tong added their names as the individuals who had prepared and approved the test methods.

44.     Mr. Xue and Mr. Tong worked together to create more than 70 such test methods for Joybees using a cache of approximately 100 Crocs test methods Mr. Tong claimed to have. Although Mr. Tong had informed McCarvel that the test methods in that cache were being used by Crocs, this did not stop McCarvel from deciding to put into place identical copies of these test methods to be used for Joybees. Thus, on or around September 30, 2021, McCarvel personally forwarded an entire library of test methods copied from Crocs's highly confidential documents to a Joybees consultant and/or manufacturing partner in Mexico. And, on or around the same day, Mr. Xue, acting at the direction of McCarvel and Joybees, sent the same test methods to Joybees's manufacturing partners in China. This was the same day that Mr. Xue had also sent Joybees's "Material Performance Standards" document to the same manufacturing partners.

45.     Defendants also planned for Mr. Xue to visit one of the factories in China producing footwear for Joybees, where he would begin implementing changes to the process for producing Joybees footwear by making changes to the process based on Crocs's test methods, quality control,

production planning, standard operating procedures, and other highly confidential information and know-how Mr. Xue had acquired while producing footwear for Crocs. All of this was done with the objective of achieving higher quality specifications for Joybees footwear than Joybees otherwise could have developed or implemented.

46.     During the process of developing these specifications, standards, and testing and audit methods for Joybees, Defendants permitted the former Crocs employees and agents to disclose Crocs's material and component specifications, quality standards, and testing methods to additional third parties, such as test labs. This was done with at least McCarvel's knowledge and approval. For instance, to resolve a manufacturing defect affecting various Joybees footwear models, McCarvel requested that Mr. Xue create test methods and other quality control standards, which he emphasized was essential for maintaining Joybees's relationship with a major retail partner. In response, Mr. Xue proposed a series of test methods, which he explained were the same as Crocs's test methods and in fact confirmed that the test methods were *created by* Crocs. Nevertheless, Mr. Xue sent these test methods, copied from Crocs's highly confidential and proprietary documents, to at least one third-party test lab, explaining that the lab would not have otherwise known how to conduct the tests.

**D.  Joybees Gains an Unfair Advantage in the Market by Using Crocs's Trade Secrets and Proprietary Information**

47.     The use of Crocs's material specifications, component specifications, quality standards, and related test methods gave Joybees a competitive advantage that it never earned.

48.     Joybees used the stolen trade secrets and proprietary information to implement dramatic improvements to quality control, which permitted Joybees to scale up its operations and make higher-quality products on a consistent basis—necessary conditions for Joybees to reliably

pitch and/or supply large national retail customers. It also allowed Joybees to grow its revenues exponentially.

49.     Joybees also used the stolen trade secrets and proprietary information to scale up operations by sharing them with multiple factories and test labs around the world, which allowed Joybees to diversify its production facilities while working to ensure consistency in quality of productions taking place in different factories.

50.     Joybees disclosed, or allowed its agent(s) and/or employee(s) to disclose, Crocs's trade secrets and proprietary information to at least one test lab that could not have performed certain material and component tests without having received the Crocs trade secrets and proprietary information.

51.     The trade secrets and proprietary information misappropriated by Defendants reflect years of trial and error and significant investments in the research and development of Crocs footwear.

52.     Within a short period of just several months, Joybees was able to accomplish what took Crocs over a decade of research, experience, trial and error:  it went from using a small subset of parameters used for its material specifications to developing and implementing a more complex and refined set of parameters and dozens of test methods needed for quality control. With this shortcut, Joybees was able to improve the quality of its footwear using the stolen Crocs documents that Defendants had acquired via improper means.

53.     The stolen trade secrets and proprietary information misappropriated by Joybees concerned practically every physical component of Joybees's footwear products, including the shoe material, the rivets, the Joybees logo, and coatings and finishes.

54.     But for the theft and misappropriation of Crocs's trade secrets and proprietary information, Joybees would not have been able to grow its brand as rapidly as it did in the 2021-2022 time period.

**E.   Joybees's Use of Crocs's Trade Secrets and Proprietary Information Has Caused Significant Harm to Crocs**

55.     Over the course of two decades, Crocs has invested a tremendous amount of resources and expertise in researching and developing the trade secrets and proprietary information that Defendants misappropriated and used in the development of Joybees footwear.

56.     At the outset, Crocs began with a small subset of parameters used to test the quality of its footwear, and those parameters evolved into a more expansive set of complex material specifications that Crocs uses today. Over time, Crocs was able to refine those parameters and develop various material specifications based on its own trial-and-error experiences and the feedback of consumers, which influenced and dictated performance needs for Crocs footwear.

57.     Crocs protects its trade secrets and proprietary information closely. Internally, the trade secrets and proprietary information are stored on a password-protected system that is restricted to authorized employees, and Crocs employees who are permitted access to the trade secrets and proprietary information are bound by non-disclosure agreements and confidentiality obligations.

58.     Crocs also requires third parties who receive Crocs's trade secrets and proprietary information to execute non-disclosure agreements and adhere to confidentiality obligations contained therein and/or in Master Supply Agreements. Crocs vets its manufacturing partners extensively, maintains close relationships with them, and conducts factory audits so that Crocs has a direct role in the manufacturing process.

59.    The unauthorized disclosure and use of Crocs's trade secrets and proprietary information causes a significant competitive harm to Crocs and diminishment to the goodwill that Crocs has built in its footwear brand. While sales of footwear made with Crocs's trade secrets and proprietary information ultimately result in lost sales for Crocs, it may not be possible to determine or calculate damages caused by the ongoing harm to Crocs's competitive advantage and goodwill, as significant as that harm may be. By contrast, Joybees has gained an unfair competitive advantage. The theft and unauthorized use of Crocs's trade secrets and proprietary information was a shortcut into the U.S. retail market that saved Joybees time and money, and jeopardizes the valuable trade secrets that rightfully belong to Crocs.

60.    In sum, the entire Joybees brand is built on a pattern of knocking off Crocs-branded footwear and stealing Crocs's proprietary information regarding sales, marketing, and manufacturing methods. Like other imitators before it, Joybees and McCarvel pursued their objective to capitalize on Crocs's success without any care for the harm it would cause Crocs. To this end, a critical aspect of the plan was the repeated solicitation and implementation of Crocs's valuable trade secrets and proprietary information to ensure that Joybees footwear would be produced with the same high-quality shoe material and components with which Crocs footwear is produced. Defendants cannot be permitted to continue, and this action is needed to stop them.

### Count I: Misappropriation Of Trade Secrets Under
### The Defend Trade Secrets Act (18 U.S.C. § 1836, et seq.)
### (Against All Defendants)

61.    Crocs incorporates herein by reference all other Paragraphs of this Complaint as if those allegations were set out explicitly herein.

62.     Crocs maintains highly confidential documents that contain confidential and proprietary information concerning the specifications and standards used to produce Crocs footwear (the "Proprietary Information").

63.     The Proprietary Information includes material specifications and standards that are used to ensure that the material in Crocs footwear meets certain performance requirements. It also includes specifications and standards used to test the quality of other components of Crocs footwear, such as rivets or logos, as well as information used to audit the facilities that manufacture Crocs-branded footwear.

64.     The Proprietary Information is not readily ascertainable or generally known in the public and gives Crocs an economic advantage over its competitors, which is threatened and harmed by Defendants' use of the Proprietary Information.

65.     Crocs maintains the Proprietary Information on a secure system that is password-protected and restricted to authorized employees.

66.     Crocs has engaged in reasonable efforts to maintain the confidentiality of the Proprietary Information. In addition to storing this information on a password-protected and restricted network, Crocs has sought to protect the confidential nature of the Proprietary Information by limiting its use and disclosure on a need-to-know basis to employees and manufacturing partners who are subject to confidentiality policies and agreements prohibiting the unauthorized disclosure, retention and use of such information.

67.     The Proprietary Information relates to a product and/or service used in, and/or intended for use in, interstate or foreign commerce, as the Proprietary Information is used in the development and manufacture of Crocs's footwear, which is sold in the United States and abroad.

68.     The Proprietary Information constitutes "trade secrets" within the meaning of the Defend Trade Secrets Act, as defined in 18 U.S.C. § 1839(3).

69.     Defendants have acquired Crocs's Proprietary Information by improper means and have improperly retained Crocs's Proprietary Information without Crocs's consent, knowledge, or authorization, and/or have failed to return Crocs's Proprietary Information in breach of their employment agreements and confidentiality obligations.

70.     Defendants, either themselves or through their agents and employees, have disclosed Crocs's Proprietary Information to third parties, including manufacturers and third-party test labs responsible for testing the quality of Joybees's footwear according to the specifications provided to them by Defendants.

71.     On information and belief, Defendants have been using and continue to use Crocs's Proprietary Information for their own benefit, and to Crocs's detriment.

72.     Defendants' misappropriation of Crocs's Proprietary Information was intentional, knowing and willful, thereby entitling Crocs to recover punitive damages and an award of attorneys' fees.

73.     On information and belief, if Defendants' conduct is not remedied, and if Defendants are not enjoined, Defendants will continue to misappropriate, disclose, and use for their own benefit, and to Crocs's detriment, Crocs's Proprietary Information.

74.     As a direct and proximate result of Defendants' misappropriation of Crocs's Proprietary Information, Crocs has suffered, and will continue to suffer, irreparable harm, as well as damages to be proven at trial. Defendants are jointly and severally liable for such damages.

**Count II: Misappropriation Of Trade Secrets Under**
**The Colorado Uniform Trade Secrets Act (C.R.S. § 7-74-101, *et seq.*)**
**(Against All Defendants)**

75.     Crocs incorporates herein by reference all other Paragraphs of this Complaint as if those allegations were set out explicitly herein.

76.     Crocs maintains confidential and proprietary documents containing Proprietary Information, as defined above.

77.     The Proprietary Information is not readily ascertainable or generally known in the public and gives Crocs an economic advantage over its competitors, which is threatened and harmed by Defendants' use of the Proprietary Information.

78.     Crocs has engaged in reasonable efforts to maintain the confidentiality of the Proprietary Information, as described above.

79.     Crocs's Proprietary Information constitutes "trade secrets" under Colorado's Uniform Trade Secrets Act, as defined in C.R.S. § 7-74-102.

80.     Defendants have acquired and retained Crocs's trade secrets by improper means without Crocs's consent, knowledge, or authorization.

81.     Defendants have disclosed Crocs's Proprietary Information to third parties, as described above.

82.     On information and belief, Defendants have been using and continue to use Crocs's Proprietary Information for their own benefit, and to Crocs's detriment.

83.     Defendants' misappropriation of Crocs's Proprietary Information was intentional, knowing and willful, thereby entitling Crocs to recover punitive damages and an award of attorneys' fees under C.R.S. § 7-74-105.

84.     On information and belief, if Defendants' conduct is not remedied, and if Defendants are not enjoined, Defendants will continue to misappropriate, disclose, and use for their own benefit, and to Crocs's detriment, Crocs's Proprietary Information.

85.     As a direct and proximate result of Defendants' misappropriation of Crocs's Proprietary Information, Crocs has suffered, and will continue to suffer, irreparable harm, as well as damages to be proven at trial. Defendants are jointly and severally liable for such damages.

### Count III: Civil Theft of Proprietary Information (C.R.S. § 18-4-405)<br>(Against All Defendants)

86.     Crocs incorporates herein by reference all other Paragraphs of this Complaint as if those allegations were set out explicitly herein.

87.     Defendants have committed unauthorized assumption and exercised the right of ownership over things of value owned by Crocs, namely, Crocs's Proprietary Information and know-how concerning certain material and component specifications, quality standards, and related test methods that Crocs owns and uses to produce Crocs footwear products.

88.     Defendants intentionally acquired, and then illegally retained and disclosed to others, Crocs's Proprietary Information and know-how, and used it to produce Joybees footwear products.

89.     The Proprietary Information is of substantial value and Crocs has a possessory or proprietary interest in the Proprietary Information.

90.     Defendants tortiously and/or knowingly obtained, retained, or exercised control over Crocs's Proprietary Information without authorization of Crocs and/or by deceiving Crocs and/or its employees in order to obtain or remove them.

91.     Defendants specifically intended to deprive and/or tortiously deprived Crocs permanently of the value of its exclusivity in its own Proprietary Information, and/or used Crocs's documents and information in such a manner as to deprive Crocs of its use or benefit.

92.     By their actions of acquiring, retaining, using, and/or disclosing Crocs's Proprietary Information, Defendants have interfered with and deprived Crocs of the ability to exercise control over its property.

93.     As a direct and proximate result of Defendants' illegal and unlawful theft of Crocs's Proprietary Information, Crocs has suffered and will continue to suffer irreparable harm, as well as damages to be proven at trial for which Defendants are jointly and severally liable. Pursuant to C.R.S. § 18-4-405, in addition to its other remedies, Crocs is entitled to recover treble damages, costs, and reasonable attorney fees.

### Count IV: Conversion under Colorado Common Law
### (Against All Defendants)

94.     Crocs incorporates herein by reference all other Paragraphs of this Complaint as if those allegations were set out explicitly herein.

95.     Defendants have committed distinct, unauthorized acts of dominion or ownership over things of value owned by Crocs, namely, Crocs's Proprietary Information and know-how concerning certain material and component specifications, quality standards, and related test and audit methods that Crocs owns and uses to produce Crocs footwear products.

96.     Defendants intentionally acquired, and then illegally retained and disclosed to others, Crocs's Proprietary Information and know-how, and used it to produce Joybees footwear products.

97.     The Proprietary Information is of substantial value and Crocs has a possessory or proprietary interest in the Proprietary Information.

98.     Defendants tortiously and/or knowingly obtained, retained, or exercised control over Crocs's Proprietary Information without authorization of Crocs and/or by deceiving Crocs and/or its employees in order to obtain or remove them.

99.     Defendants intended to deprive and/or tortiously deprived Crocs permanently of the value of its exclusivity in its own Proprietary Information, and/or used Crocs's documents and information in such a manner as to deprive Crocs of its use or benefit.

100.     By their actions of acquiring, retaining, using, and/or disclosing Crocs's Proprietary Information, Defendants have interfered with and deprived Crocs of the ability to exercise control over its property.

101.     As a direct and proximate result of Defendants' illegal and unlawful conversion of Crocs's Proprietary Information, Crocs has suffered and will continue to suffer irreparable harm, as well as damages to be proven at trial.

## Count V:  Unjust Enrichment
## (Against All Defendants)

102.     Crocs incorporates herein by reference all other Paragraphs of this Complaint as if those allegations were set out explicitly herein.

103.     Defendants, through their misconduct, have obtained the significant financial benefit of Crocs's investments in its Proprietary Information to which they are not entitled, as they did not have to invest in the research and development that would have been required to produce such expansive and high-quality material specifications, components specifications, quality standards, and/or related testing and audit methods.

104.     As Defendants acquired these benefits intentionally, at Crocs's expense, and with full knowledge of their wrongdoing, equity and good conscience require restitution to Crocs,

including disgorgement of Joybees's profits earned on each shoe producing used Crocs's trade secrets, other proprietary information, and know-how.

105.    Defendants have retained these benefits under circumstances that make it unjust and inequitable for Defendants to retain those benefits without paying Crocs the value of the benefits Defendants acquired.

106.    As a result, Crocs is entitled to recover the significant financial benefits that Defendants have obtained through their misconduct in an amount to be determined at trial for which Defendants are jointly and severally liable.

**Count VI: Tortious Interference with a Business Relationship
or Prospective business Relationship
<u>(Against all Defendants)</u>**

107.    Crocs incorporates herein by reference all other Paragraphs of this Complaint as if those allegations were set out explicitly herein.

108.    Defendants Joybees and McCarvel set out to recruit current and former Crocs employees, as well as other individuals bound by non-disclosure agreements with Crocs, to produce footwear for Joybees using Crocs's Proprietary Information.

109.    Crocs's employment agreements and non-disclosure agreements are valid agreements, and provide for the protection of Crocs's Proprietary Information after the end of a given employment relationship.

110.    Defendants Joybees and McCarvel knew, or reasonably should have known, that the Crocs employees and agents they solicited were bound by contracts imposing non-disclosure and confidentiality obligations not to acquire, retain, solicit, disclose, and/or use Crocs's Proprietary Information without Crocs's consent, knowledge, or authorization, in part because McCarvel agreed to such a non-disclosure agreement himself.

111.    Defendants intended to cause Crocs's current and former employees and agents to violate the terms of their non-disclosure agreements so that they could acquire Crocs's Proprietary Information and use it to produce footwear for Joybees. In some cases, they intended to cause Crocs's employees and agents to violate the terms of their non-disclosure agreements by soliciting their employment at Joybees or otherwise by hiring them to perform services for Joybees with the expectation that the individual employee or agent would disclose and/or use Crocs's Proprietary Information in the production of footwear products for Joybees.

112.    The interference with Crocs's current and former employees and agents, and their non-disclosure agreements with Crocs, was intentional and improper, and Defendants understood that their interference was improper, as they were acting in bad faith and with the intent to gain an unfair economic advantage at Crocs's expense.

113.    As a direct and proximate result of Defendants' interference, Crocs has suffered and will continue to suffer irreparable harm, as well as damages to be proven at trial.

### Count VII: Breach of Contract
### <ins>(Against McCarvel)</ins>

114.    Crocs incorporates herein by reference all other Paragraphs of this Complaint as if those allegations were set out explicitly herein.

115.    During his employment at Crocs, Defendant McCarvel entered into a valid employment agreement with confidentiality provisions prohibiting the unauthorized acquisition, solicitation, retention, use, and or/disclosure of Crocs's Proprietary Information, as defined above.

116.    Crocs performed its obligations under the agreement by employing McCarvel and compensating him for the performance of agreed-upon services.

117.     McCarvel did not perform under the agreement, as he failed to engage in good faith and fair dealing with Crocs and violated his confidentiality and non-disclosure obligations by illegally acquiring, soliciting, retaining, using, and/or disclosing Crocs's Proprietary Information.

118.     As a result of his breach, Crocs has suffered and will continue to suffer irreparable harm, as well as damages to be proven at trial.

### PRAYER FOR RELIEF

**WHEREFORE,** by reason of the foregoing, Plaintiff Crocs requests that this Court enter judgment in its favor and for relief against Defendants, and each of them, as follows:

(a)     That the Court enter a judgment that:

1.     Each Defendant has committed theft and misappropriation of trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*;

2.     Each Defendant has violated the Colorado uniform Trade Secrets Act, C.R.S. § 7-74-101, *et seq.*;

3.     Each Defendant has engaged in civil theft in violation of C.R.S. § 18-4-405;

4.     Each Defendant has engaged in conversion in violation of Colorado common law;

5.     Each Defendant has been unjustly enriched;

6.     Each Defendant engaged in tortious interference with a business advantage by soliciting Crocs's Proprietary Information and its current and former employees and agents;

7.     Defendant McCarvel violated the terms of his employment agreement with Crocs, including his non-disclosure and confidentiality obligations, thereby committing a breach of contract under Colorado common law; and

8.     Defendants are jointly and severally liable for items (1)-(4) and directly above;

(b)     That the Court issue an Order requiring that Defendants take affirmative actions to cease using and disclosing Crocs's Proprietary Information, as defined above, and to take affirmative actions to protect Crocs's Proprietary Information from use or disclosure by themselves and other third parties, including by seizing and returning the Proprietary Information to Crocs in their and/or their attorneys' possession, custody and control within twenty-four (24) hours, together with a signed

representation that Defendants, and their attorneys, did not alter, destroy, remove, copy or retain any document, file or information;

(c)    That the Court issue injunctive relief enjoining Defendants and all of their agents, servants, employees, successors and assigns, and all persons in active concert or participation with Defendants from:

    1.    Using, disclosing, or misappropriating Crocs's Proprietary Information, as defined above;

    2.    Manufacturing, producing, selling, marketing, advertising, importing, or distributing footwear products made using Crocs's Proprietary Information;

(d)    That the Court issue preliminary injunctive relief requiring Defendants to set aside into escrow their profits earned from the production and sale of footwear made using Crocs's Proprietary Information, as warranted upon the results of expedited discovery into Defendants' whereabouts, business structure, solvency, and/or dissipation of assets;

(e)    That the Court award Crocs damages and costs to the fullest extent available under Colorado law, including treble damages under C.R.S. § 18-4-405;

(f)    That the Court award Crocs damages and costs to the fullest extent available under the Defend Trade Secrets Act;

(g)    That the Court award Crocs reasonable attorneys' fees under 18 U.S.C. § 1836(b)(3) on account of Defendants' willful and malicious misappropriation of Crocs's Proprietary Information;

(h)    That the Court award Crocs the value of the unjust enrichment to Defendants arising from the misappropriation of Crocs's Proprietary Information by disgorging Defendants' profits and/or providing restitution as appropriate;

(i)    That the Court award punitive and exemplary damages for the intentional harm inflicted on Crocs by Defendants;

(j)    That the Court award Crocs pre-judgment and post-judgment interest;

(k)    That the Court award Crocs the value of its reasonable attorneys' fees and costs pursuant to at least the Defend Trade Secrets Act and C.R.S. § 18-4-405; and

(*l*)    That the Court award Crocs all such further and other relief as this Honorable Court deems just and adequate.

## <u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedures, Plaintiff hereby demands a trial by jury.

Dated: July 6, 2023

Respectfully submitted,

*/s/ Suneeta Hazra*

**ARNOLD & PORTER KAYE SCHOLER LLP**

Suneeta Hazra
1144 Fifteenth Street, Suite 3100
Denver, CO 80202
Tel: (303) 863-1000
Fax: (303) 863-2301
Email: Suneeta.Hazra@arnoldporter.com

Sean M. Callagy
Isaac L. Ramsey
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111
Tel: (415) 471-3100
Fax: (415) 471-3400
Email: Sean.Callagy@arnoldporter.com
Email: Isaac.Ramsey@arnoldporter.com

**KELLEY DRYE & WARREN LLP**

Jonathan K. Cooperman
Brianna J. Santolli
175 Greenwich Street
New York, NY 10007
Tel: (212) 808-7800
Fax: (212) 808-7897
Email: JCooperman@KelleyDrye.com
Email: BSantolli@KelleyDrye.com

*Counsel for Plaintiff Crocs, Inc.*